1  **MCGUIREWOODS LLP**
ALICIA A. BAIARDO SBN #254228
2  abaiardo@mcguirewoods.com
JENNY YI SBN #314540
3  jyi@mcguirewoods.com
Two Embarcadero Center
4  Suite 1300
San Francisco, CA  94111-3821
5  Telephone:  415.844.9944
Facsimile:  415.844.9922
6

7  *Attorneys for Panasonic Corporation*
*of North America*

8
                    **UNITED STATES DISTRICT COURT**
9
          **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**
10

11

12  PANASONIC CORPORATION OF        CASE NO.
    NORTH AMERICA,

13           Plaintiff,              **COMPLAINT FOR DAMAGES**

14      vs.                            1. **Violation of Racketeer Influenced**
                                          **and Corrupt Organizations Act**
15  POWERTREE SERVICES, INC.,          2. **Breach of Contract**
    POWERTREE SAN FRANCISCO            3. **Breach of Implied Covenant of Good**
16  ONE, LLC, DANLIN                      **Faith and Fair Dealing**
    CORPORATION, and DOES 1-20        4. **Anticipatory Breach of Contract**
17  inclusive,                         5. **Conversion**
                                       6. **Unjust Enrichment**
18           Defendants.               7. **Fraud**
                                       8. **Fraud by Concealment**
19                                     9. **Negligent Misrepresentation**

20

21                                   **DEMAND FOR JURY TRIAL**

22

23        Plaintiff Panasonic Corporation of North America ("Panasonic") brings this action to

24  recover damages against Defendants Powertree Services, Inc. ("Powertree"), Powertree San

25  Francisco One, LLC ("PTSF1"), Danlin Corporation ("Danlin") and DOES 1-20 (collectively

26  "Defendants"). The following allegations are based upon Panasonic's knowledge with respect to its

27  own acts and information and belief and the investigation of counsel as to all other matters.

28

                                        1

**INTRODUCTION**

1.     In 2013, Panasonic entered into an Engineering, Procurement and Construction Contract ("EPC") with Powertree, PTSF1, and Danlin to build solar generation arrays, electric vehicle charging stations, and energy storage solutions (the "Project Units") at various multi-tenant buildings throughout San Francisco, California and the surrounding Bay Area (the "Project").

2.      Part of Panasonic's return included incentive payments from the State of California once all required benchmarks were met, required licenses were obtained, and the Project was completed on time.

3.     After the Project commenced, Defendants continuously funneled monies to themselves for various "Project"-related expenses, while Panasonic is informed and believes they were knowingly, intentionally and fraudulently lining their own pockets under the guise of it being for the "Project".

4.      As alleged in more detail below, Defendants unlawfully schemed, through the use of mail and wire, to defraud Panasonic for millions of dollars while knowing that they were far out of reach to meet any of the milestones needed to complete the Project.

**PARTIES**

5.     Panasonic Corporation of North America is and at all times relevant hereto a Delaware corporation, with its principal place of business in New Jersey.

6.     Powertree Services, Incorporated is a Delaware corporation with its headquarters in San Francisco, California.

7.     Powertree advertises itself as a leader in solar panel innovation and implementation with patented technology.

8.     Powertree participated in the scheme to defraud Panasonic of millions of dollars alleged herein from its California offices, including the decision (and/or ratification of the decision) to enter into agreements with PTSF1, Danlin and DOES 1-20 to deceive and misrepresent to Panasonic that accelerated funding was required to meet Self-Generation Incentive Program  ("SGIP")-incentive deadlines, when it already knew that meeting even the extended

1  deadlines were impossible.

2      9.     Powertree San Francisco One, LLC is a Delaware limited liability company with its

3  sole member residing in San Francisco, California.

4      10.    PTSF1 is a subsidiary and/or affiliate of Powertree and under the direct control and

5  supervision of Powertree.

6      11.    Panasonic is informed and believes that Powertree and PTSF1 were each the agent,

7  servant, or employee of one another and acted within the purpose, scope and course of said

8  agency, service, or employment, and with the express and implied knowledge, permission, and

9  consent of each other, and ratified and approved the acts of one another.

10     12.    Danlin Corporation is a Delaware corporation with its headquarters in San Rafael,

11  California.

12     13.    Danlin advertises itself as specializing in the construction, installation, and

13  integration of solar energy.

14     14.    Danlin partnered with Powertree and PTSF1 to deceive and fraudulently

15  misrepresent to Panasonic the real status of the Project in order to accelerate more funds while

16  knowing that the Project would never be completed to meet the extended deadlines granted by the

17  California Public Utility Company ("CPUC").

18     15.    Further, Danlin misappropriated Project funds by redistributing it to itself and

19  Powertree and PTSF1.

20                          **JURISDICTION AND VENUE**

21     16.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331 based on the

22  federal claims asserted under the Racketeer Influence and Corruption Organizations Act, 18

23  U.S.C. §§ 1961, *et seq.*, and 18 U.S.C. §§ 1331, 1962, and 1964.

24     17.    This Court may exercise supplemental jurisdiction over Plaintiff's state law claims

25  pursuant to 18 U.S.C. § 1367 because all of Plaintiff's state-law claims are derived from a

26  common nucleus of operative facts and are the kind that Plaintiff would ordinarily expect to try in

27  one judicial proceeding.

28     18.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965

1    and arising from their contacts with California, by which they intentionally availed themselves to

2    the protections afforded under California law, including but not limited to entering of the

3    agreements at issue in this litigation in the state of California, and the construction of Project Units

4    in the California.

5        19.    Venue is proper in this District pursuant to 18 U.S.C. § 1391(b) because it is where

6    Defendants maintain their respective principal place of business in California and it is where the

7    majority of the events at issue occurred.

8                                    **INTRADISTRICT ASSIGNMENT**

9        20.    Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-2(d),

10    assignment to the San Francisco division is appropriate because a substantial part of the events

11    which give rise to the claims occurred in the County of San Francisco.

12                                    **FACTS COMMON TO ALL COUNTS**

13    **The Project**

14    *Background*

15        21.    California is the leading state in the nation when it comes to promoting and

16    incentivizing renewable energy innovation and implementation within the state. The CPUC has a

17    SGIP which has "incentives to support existing, new, and emerging distributed energy resources"

18    (the "SGIP Incentive").[1]

19        22.    To participate in the SGIP and receive state-sponsored incentive payments, a party

20    must go through the application process through its utility company, here the Pacific Gas and

21    Electronic Company ("PG&E").

22        23.    Once approved for a reservation, the participating party must meet certain

23    milestones within a designated time period to retain its incentive reservation and ultimately

24    receive the incentive upon approval from the CPUC and completion of the project.

25        24.    Obtaining and maintaining a reservation for SGIP Incentives requires meeting

26

27    ---

28    [1] *Self-Generation Incentive Program*, California Public Utilities Commission,
*https://www.cpuc.ca.gov/sgip* (last visited Oct. 4, 2019).

1    certain milestones and qualifications set forth by the CPUC.

2         25.    Each applicant is provided with deadlines by the CPUC which must be met to

3    continue holding the incentive reservation and receive payment upon completion of the project.

4         26.    Because the SGIP program is highly sought after, losing a reservation necessarily

5    means that the reserved incentives are allocated to another applicant.

6         27.    Initially, a Panasonic representative met Stacey Reineccius ("Reineccius"), Chief

7    Executive Officer and Director of Powertree, at a renewable energy convention.

8         28.    Panasonic agreed to partner with Defendants as an investor in the construction and

9    development of the Project Units in multi-tenant properties around the San Francisco Bay Area.

10   *The EPC*

11        29.    On April 9, 2013, Panasonic entered into the EPC with Defendants.

12        30.    Under the EPC, Panasonic is named as the EPC Contractor, Danlin as the

13   Installation Contractor, PTSF1 as the Equipment Purchaser/Owner, and charges Powertree with

14   Engineering, Design & Performance Oversight (and subcontractor to Danlin) (collectively, the

15   "Parties").

16        31.    Pursuant to the EPC, the Parties agreed to build and construct sixty-eight Project

17   Units among various multi-tenant sites in San Francisco and surrounding Bay Area (the "Sites").

18        32.    The Project was comprised of sub-projects (phases).

19        33.    The first phase was to build two sites, then five twelve-site phases, and finally a

20   six-site phase.

21        34.    As the EPC Contractor, Panasonic provided the agreed upon funding for the Project

22   ("Contribution").

23        35.    Panasonic's Contribution was comprised of payments to Danlin for $28,000 per

24   Site to initiate the installation, $10,000 per site upon commencement of that particular Site's

25   project, and $2,500 per Site upon completion.

26        36.    Under the terms of the EPC, Panasonic would advance $2.754 million and

27   ultimately receive $2.994 million back.

28        37.    This was compromised of payment of $41,251 per site upon receipt of the SGIP

Incentive and $2,044 per site upon close of sale / securing secondary financing for a total value of $2.94 million, for a total net gain for Panasonic of $190,000.

38.     Under the EPC, Powertree was required, among other things, to oversee Project engineering, design, SGIP incentive application and payment, required permits, and ultimately the SGIP incentive upon completion of the Project.

39.     As Installation Contractor, the EPC required Danlin to act as the general contractor executing the coordination and completion of the Project Unit construction.

40.      The EPC required PTSF1 to be the equipment purchaser and owner of the Project Units.

41.     With the payments advanced by Panasonic, Danlin was to purchase the materials needed, provide the labor, and install the Project Units to meet the requirements set forth by the CPUC and governmental agencies.

42.     Powertree applied for the SGIP Incentive and work commenced on the Project.

**The Scheme**

43.     Defendants' Project scheme was put into place prior to 2012 when they first applied for the SGIP Incentive reservation.

44.     As experts in the renewable energy and solar power industry, Defendants were knowledgeable and experienced with California renewable incentives and federal tax credits, and also knew that a large-scale project could net them millions of dollars.

45.     Defendants were not equipped to finish the Project and Panasonic is informed and believes they never intended to complete the Project.

46.     Rather, the Project was a scheming vehicle for Defendants to funnel money into company expenses not directly related to the construction of the project or within the provisions of the EPC which benefitted Defendants directly, without completing the Project.

47.     Defendants at all times relevant represented to Panasonic that the Project was a legitimate investment vehicle and that they were capable of timely engineering, constructing, and implementing the Project Units as required to receive the SGIP Incentive.

48.     As such, and as set forth in and in compliance with the EPC, Panasonic wired

1   Danlin $2.242 million of the original $2.75 million on or before November 2, 2015 with the

2   expectation that Defendants would meet the milestones and deadlines required for the SGIP

3   Incentive.

4         49.    Defendants, without notifying Panasonic, were instead deliberately delaying the

5   completion of the Project and misrepresenting to Panasonic that delays were due to PG&E and

6   interconnection issues.

7         50.    In filings with the CPUC, PG&E represented that it was not the cause of these

8   delays and that it had already entered into two interconnection agreements with Defendants for

9   two locations and that it (PG&E) was willing to enter into interconnection agreements for other

10  locations but Powertree was purposefully delaying that process.

11        51.    These delays were caused by Defendants' failure to request interconnection

12  agreements with PG&E. At the very least, the delays were caused by Defendants' negligent

13  handling of the Project and negligent work in obtaining the required agreements with PG&E.

14        52.    Panasonic is informed and believes that Defendants chose not to enter into

15  additional interconnection agreements for the rest of the Units for the sole purpose of delaying the

16  Project in order to seek accelerated funds from Panasonic on the purported grounds that the delays

17  were PG&E's fault.

18        53.    Defendants subsequently sought an additional $3.30 million from Panasonic

19  ("Additional Contribution") on the grounds this Additional Contribution was needed to timely

20  complete the Project and still receive the SGIP Incentive based upon the fraudulent

21  misrepresentation to Panasonic that the construction delays were *PG&E's fault*.

22        54.    Relying on Defendants' representations that the construction delays were due to

23  PG&E and could be corrected to still receive the SGIP Incentive, Panasonic agreed to provide

24  Defendants with the requested additional $3.30 million in order to allow Powertree to accelerate

25  its construction schedules.

26        55.    At that time, Powertree falsely represented to Panasonic that 57 projects had

27  reached the mobilization stage and falsely represented that the issues with PG&E could be

28  corrected.

56.     Defendants knew that the delay was caused by them and that they could correct the problem by executing the previously agreed upon interconnection agreements for the remaining Units with PG&E

57.     However, in August 2015, the CPUC granted Powertree a third six-month extension to meet its SGIP Incentive reservation deadlines.

58.     Defendants at the very least negligently did not advise Panasonic of these issues until November 2015 when it requested the additional funding and never informed Panasonic that the construction was so far behind that the SGIP reservation was at risk.

59.     Although Panasonic had already paid Danlin $2.24 million of the $2.75 million agreed upon in the original EPC Contract, Panasonic paid the additional $3.30 million because Powertree's repayment to Panasonic was tied to receipt of the SGIP Incentive.

60.     Panasonic, however, made the additional investment subject to additional security.

61.      As a result, the Parties entered into additional security agreements.

**Amendment and Additional Security Agreements**

62.     On December 17, 2015, Panasonic, Powertree, PTSF1, and Danlin executed an amendment to the EPC ("Amendment").

63.     The Amendment set forth that Panasonic would pay the subcontractor, Danlin, the originally agreed upon amount in the EPC of $40,500 for the site located at 361 14th Street and an increased amount of $108,939 for the remaining 57 sites, for a total advance of $6.25 million.

64.     In return, Panasonic would be repaid $3.26 million upon receipt of the SGIP incentive.

65.     $2.82 million of this $3.26 million would be paid over time in monthly payments depending on the kilowatt hours delivered, and the remaining $661,000 would be paid to Panasonic at close of sale for a total value of $6.75 million.

66.     As of February 7, 2018, Panasonic had wired Danlin a total of $4.905 million. Panasonic also separately paid for the equipment, at a value of over $314,000.

67.      Panasonic expected to net $1.845 million as a result of the Project following the EPC amendments.

68.     Given that Powertree had failed to meet its original obligations under the EPC, Panasonic only agreed to provide additional funding subject to Powertree's provision of additional security.

69.     Consequently, Powertree and its related entities signed three additional documents along with the Amendment: the December 17, 2015 Pledge and Security Agreement ("PSA"), the December 17, 2015 Security Agreement ("Security Agreement") and the December 17, 2015 Equity Option Agreement ("EOA").

70.     The PSA provides Panasonic with the first priority perfected security interest and lien on Powertree and PTSF1's assets.

71.     It also provides Panasonic with 100% of the equity interests and capital stock of PTSF1, which is the project owner as well as counterparty under the EPC agreement, and owned 100% by Powertree.

72.     The Security Agreement provides Panasonic a first priority, perfected security interest and lien on PTSF1.

73.     The EOA provides Panasonic with the right to call away Reineccius' and Frank Gobar's ("Gobar") ownership interests in Powertree, who collectively own more than 51% of Powertree.

**Continued Delays with Project**

74.     On February 5, 2016 Powertree submitted a petition to the CPUC requesting another extension of its project completion deadlines on the grounds of "unavoidable interconnection issues" caused by PG&E (the "February 2016 Petition").

75.     In the February 2016 Petition, Powertree stated that 58 of its original 68 Self-Generation Incentive Program ("SGIP") applications from September 2012 remained active.

76.     Powertree also requested expedited consideration and an interim stay of the reservation expiration deadline until Powertree and PG&E could complete the interconnection process and PG&E approved Powertree's completed SGIP claim forms.

77.     For these tasks, Powertree requested an open-ended extension of time.

78.      The CPUC declined to provide the requested open-ended deadline as it was not

1  willing to make an exception that it never had before.

2      79.     Instead, the CPUC gave Powertree a final deadline of December 30, 2016 to

3  complete the project or lose the SGIP reservation.

4      80.     Defendants knew that they would never meet the December 30, 2016 deadline.

5      81.     By early December 2016, Defendants had only completed the interconnection of

6  *two* Project Units.

7      82.     Defendants knew before December 2016 that they would never meet the deadlines

8  set forth by the CPUC yet they continued to misrepresent the status of the Project to Panasonic as

9  part of their scheme to extract additional funds for a project that was never going to get completed.

10     83.     Despite these acceleration payments, Defendants did not complete the Project by

11 December 30, 2016.

12     84.     As a result, Powertree lost its reservation to collect the SGIP incentives.

13     85.     Knowing that they were never going to complete the project or have the funds to

14 repay Panasonic, in late 2017, Defendants requested Panasonic invest *another* $2.6 million to

15 "finish" the Project and make the Sites operational.  At that time, Powertree represented the status

16 of the Projects to Panasonic as follows and advised it had run out of funds to finish the Project:

17 18
- **Solar PV System** – 47 of 58 projects have solar PV systems installed, but are not operational to preserve 30% Investment Tax Credit for the accompanying battery storage systems.

19
- **EV Chargers** – 53 of 58 EV charging stations have been installed and 25 sites signed off.

20 21
- **Battery System** – 3 of 58 with full system installed, 2 of 3 are operable. 16 of 58 are partially installed, $683k of prepaid materials with battery vendor.

22     86.     Panasonic declined Defendants' request for another $2.6 million.

23     87.     Defendants continued to look for additional investors to "finish" the Project.

24     88.     No additional work has been done at any site since February 2018 and all equipment

25 for the Project remains on the properties in varying stages of construction.

26     89.     Alarmed with the slow progress of the Project despite the large advances, Panasonic

27 requested an accounting of the Project in the summer of 2018. Danlin provided Panasonic with a

28 summary of expenses dated August 31, 2018 ("Danlin Summary").

90.     The Danlin Summary states "Monies Contributed by Panasonic" amounted to $5,947.523.00, and that the "Total Expense" was $3,900,093.00.

91.     Of the $3.9 million in total expenses, Danlin included, among other things, unauthorized and unnecessary expenses for a subcontractor, such as (a) Legal - $394,307.86; (b) Business Development - $18,342.17; (c) Marketing - $57,216.56; and (d) Consulting - $556,226.24.

92.      Danlin's total, including the cost of goods sold and total expenses, amounts to $6,625.952.57, leaving a negative balance of $678,429.57.

93.     There are no dates provided with these expenses.

94.     In addition, the Danlin Summary does not account for the missing $2 million between Panasonic's contributions and Danlin's expenses.

## FIRST CLAIM FOR RELIEF
### Violations of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c)
### (Against All Defendants)

95.     Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-94 of this Complaint.

96.     Panasonic brings this claim for relief pursuant to 18 U.S.C.  §§ 1962(c) and 1965 of RICO against Powertree, PTSF1, Danlin, and DOES 1-20 (for purposes of this cause of action, "Defendants").

**The Enterprise**

97.     Panasonic is a "person" as that term is defined in 18 U.S.C. § 1963(3) because it is an entity capable of holding legal and beneficial interest in property and was injured in its business and property as a result of Defendants' wrongful conduct.

98.     Defendants are, and at all relevant times were, "persons" within the meaning of 18 U.S.C. § 1963(3) because they are entities capable of holding legal or beneficial interest in property.

99.     Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

100. Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).

101. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

102. An association-in-fact enterprise generally has three structural features, including: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

103. As alleged below and throughout this Complaint, Defendants orchestrated a scheme to extract millions of dollars from Panasonic by delaying the construction of the Project, by knowingly and deliberately not cooperating with PG&E to enter into the required interconnection agreements to complete the project, and unnecessarily putting the SGIP Incentive at risk so that Defendants could position the Project as needing accelerated funds to complete the project.

104. Defendants conducted their business through association-in-fact enterprises in violation of section 1962(c) by a pattern of racketeering activity, including mail and wire fraud, for the purpose of improperly profiting from unlawfully misrepresenting the status of the Project and manipulating government incentive programs to assist the execution of its scheme.

105. The scheme enabled Defendants to enjoy undisclosed payments to themselves, as reflected in the Danlin Summary, through fraudulent fees and payment for work they never intended on completing.

106. Powertree, PTSF1 and Danlin formed an association-in-fact, referred to as the "Powertree-Danlin Enterprise." The Powertree-Danlin Enterprise included (1) Powertree, its subsidiaries, employees and agents; (2) PTSF1, its subsidiaries, employees, and agents; and (3) Danlin, its subsidiaries, employees and agents.

107. The Powertree-Danlin Enterprise was formed for the purpose of unlawfully extracting significant funds from Panasonic by misrepresenting the Project, the true status of the

Project, that delays were caused by PG&E, and for the sole purpose of sharing the illegally-obtained funds amongst the members of the enterprise.

108.    At all times relevant, each member of the Powertree-Danlin Enterprise was aware of the enterprise's purpose and conduct, and was a knowing, willing, and active participant in the conduct.

109.    Each member of the enterprise reaped substantial proceeds of the $4.905 million provided for work that was not done.

110.    Each member of the Powertree-Danlin Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs. But, at all relevant times, the enterprise, and each member thereof: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization of legal entities, including the Defendants, along with other individuals and entities, including unknown third parties.

111.    The members of the Powertree-Danlin Enterprise are systemically linked through continually coordinated activities, financial ties, and contractual business arrangements.

112.    Panasonic is informed and believes that the Powertree-Danlin Enterprise is an ongoing and continuing enterprise.

113.    Powertree, PTSF1, nor Danlin could have accomplished the purpose of the Powertree-Danlin Enterprise without the assistance of the others and all profited financially from the scheme.

114.    The Powertree-Danlin Enterprise described above involved regular communications between Powertree, PTSF1, and Danlin in which the Project plans and implementation was exchanged to facilitate the goals of the enterprise.

115.    Such communications occurred, and continues to occur, through the mail and wire facilities of the United States.

116.    The members of the Powertree-Danlin Enterprise functioned as a continuing unit for the purposes of implementing the scheme, and each agreed to take actions to hide the existence of the scheme, as well as the continuing association-in-fact enterprise from others.

117.    The Powertree-Danlin Enterprise engaged in and affected interstate commerce because it advertised and sold its services across the United States to the employees and agents of Panasonic, and purchased materials and goods from providers across the United States.

118.    The effects of the Powertree-Danlin Enterprise are still felt today because they have failed to do any work on the Project and have no intention of repaying Panasonic.

**Conduct of the Powertree-Danlin Enterprise**

119.    Powertree, PTSF1, and Danlin exerted control over the Powertree-Danlin Enterprise and participated in the operation and management of its affairs, directly and indirectly.

120.    Powertree and PTSF1 participated in the operation and management of the enterprise in the following ways:

a)    Misrepresenting the status of the Project to Panasonic, the CPUC, and PG&E;

b)    Transmitting false status reports to Panasonic;

c)    Misrepresenting the ability to complete the Project by the deadlines set forth by the CPUC to retain the SGIP reservations;

d)    Misrepresenting the ability to speed up construction of the Project Units with accelerated funds from Panasonic;

e)    Receiving payments from Danlin for the Project;

f)    Concealing the true nature of its relationship with Danlin;

g)    Covering up the delay to the construction of the Project by placing the blame on PG&E;

h)    Misrepresenting that interconnection issues were due to PG&E, while omitting that it had refused to execute the required agreements with PG&E for interconnection.

121.    The Powertree-Danlin Enterprise was a hierarchical decision-making structure headed by Powertree.

122.    Powertree generally directed the course of the Project, applied for the permits and incentive reservations, represented the state of the Project to the utility, CPUC, and Panasonic, and was in charge of the overall implementation and completion of the Project.

123.    Powertree generally directed Danlin regarding the finances related to, and

construction of the Project Units.

124.    Danlin also participated in and conducted the affairs of the Powertree-Danlin Enterprise, in the following ways:

     a)     Falsifying financial accounting of the funds received from Panasonic for the Project;

     b)     Siphoning funds to Powertree, PTSF1 and itself for falsified expenses;

     c)     Purposefully delaying the construction of the Project for purposes of getting accelerated funding from Panasonic;

     d)     Misrepresenting the progress of the construction and associated causes for delay.

125.    Defendants also directed and controlled the ongoing organization necessary to implement the common purpose of the enterprise and meetings and through communications which Plaintiffs cannot fully allege at present, because Defendants and other third-parties currently possess such documents.

**Pattern of Racketeering Activity**

126.    Defendants carried out their scheme through a pattern of racketeering activity that employed the use of United States mail and wire facilities.

127.    Defendants accomplished this scheme by committing, conspiring to commit, and/or aiding-and-abetting the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§1341 and 1343) within the past five years.

128.    Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(a)(B)) include, but are not limited to:

- Mail Fraud:    Defendants violated 18 U.S.C. § 1341 by sending and/or receiving, or causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers, for the purpose of executing the unlawful and fraudulent scheme to profit from the Project.

- Wire Fraud:    Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful and fraudulent scheme to profit from the Project.

129.    The Powertree-Danlin Enterprise's pattern of racketeering likely involved separate instances wherein the U.S. Mail or interstate wire facilities were knowingly and intentionally used

1  to further the enterprise's pattern of racketeering activity, including mail and wire fraud.

2       130.    Many of the precise dates of Defendants' fraudulent use of the U.S. Mail and wire

3  facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books

4  and records.

5       131.    Panasonic has, however, described the types of predicate acts of mail and/or wire

6  fraud occurred.

7       132.    They include hundreds of communications to perpetuate and maintain the Powertree-

8  Danlin Enterprise's scheme, including the things and documents below.

9       133.    Powertree, PTSF1 and Danlin's use of the mail and wire includes, but is not limited

10  to:

11      a)  Correspondence between Defendants and Panasonic;

12      b)  Requests for accelerated funds from Defendants to Panasonic;

13      c)  Transfers of funds sent from Panasonic to Defendants;

14      d)  Transfers of funds between Powertree, PTSF1 and Danlin for non-Project authorized

15          expenses;

16      e)  Correspondence sent by Danlin to suppliers and other third parties for construction

17          materials in furtherance of the Powertree-Danlin Enterprise scheme.

18       134.    The Powertree-Danlin Enterprise also communicated by U.S. Mail, interstate

19  facsimile, and by interstate electronic mail with various other third-party entities in furtherance of

20  the Powertree-Danlin Enterprise's mail and wire fraud.

21       135.    Powertree, PTSF1, and Danlin knew, and intended that, Panasonic would rely on the

22  material misrepresentations and omissions made by them and would invest in the Project and send

23  accelerated funds to meet pertinent deadlines. Indeed, if Panasonic did not accelerate funds for the

24  Project, the Powertree-Danlin Enterprise could not succeed.

25       136.    Each of these fraudulent mailings and interstate wire transmissions constitutes

26  "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations

27  constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through

28  which Powertree, PTSF1 and Danlin intended to and did defraud Plaintiff.

137.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting its victim, Panasonic.

138.   The pattern of racketeering activity alleged herein and the Powertree-Danlin Enterprise are separate and distinct from each other.

139.   Likewise, Powertree, PTSF1 and Danlin are distinct from the Powertree-Danlin Enterprise, they have separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

140.   Defendants' final racketeering activity occurred within five years of the commission of a prior incident of racketeering.

**Damages**

141.   Defendants' pattern of racketeering activity directly and proximately caused Panasonic injury in their business and property because it caused Panasonic to advance funds based on the misrepresentations made by Defendants that the SGIP Incentive would be lost without it.

142.   Panasonic is the most directly harmed entity and there are no other parties better suited to seek a remedy from Powertree, PTSF1 and Danlin for the economic harms at issue here.

143.   Panasonic also seeks all legal relief as allowed by law, including *inter alia,* actual damages and treble damages.

144.   Panasonic also seeks attorney's fees, all costs and expenses of suit, and pre- and post-judgment interest pursuant to 18 U.S.C. ¶ 1964(c).

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**(Against All Defendants)**

145.   Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-144 of this Complaint.

146.   Panasonic and Defendants entered into valid and enforceable agreements, namely the EPC and EPC Amendment (the "Agreements").

147.     Under the Agreements, Defendants promised to use "best commercial efforts" to complete the rebate, permit and interconnection processes in a timely manner.

148.     Defendants also agreed to "reasonable diligence" in avoiding or mitigating any delays or default in performance of the contract, *even where* the delay or default is caused by a third party (like PG&E).

149.     Defendants agreed to obtain the required permits required to complete the Project and complete the process of getting approval and payment of the SGIP Incentive.

150.     Defendants breached the terms of the Agreements by, among other things, not failing to utilize "best commercial efforts", employing "reasonable diligence", failing to timely completing the Project and losing the SGIP Incentive reservation.

151.     Defendants further breached the Agreements by distributing Panasonic's Contribution and Additional Contribution to themselves for unearned and unauthorized items.

152.     Panasonic performed all, or substantially all, of the obligations imposed on it under the Agreements.

153.     Panasonic sustained damages as a result of Defendants breaches of the Agreements, including but not limited to, damages in the form of its Contribution and Additional Contribution, federal tax rebates which would have been received upon completion of the Project and lost profits.

## THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

154.     Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-153 of this Complaint.

155.     Panasonic and Defendants entered into valid and enforceable agreements, namely the Agreements.

156.     Each contract carries with it an implied duty to act in good faith and fair dealing and the implied agreement that no party will prevent the other from realizing the full benefit of the contract.

157.     In accordance with the Agreements, Defendants had a duty to use "best commercial efforts" to complete the rebate, permit and interconnection processes in a timely manner.

158.     Defendants also agreed to "reasonable diligence" in avoiding or mitigating any delays or default in performance of the contract, *even where* the delay or default is caused by a third party (like PG&E).

159.     Under the Agreements, Defendants had a duty to obtain permits, obtain and maintain the SGIP Incentive reservation with the CPUC, and carry out the construction and implementation of the Project in order to receive the SGIP Incentive.

160.     Under the same Agreements, Panasonic had the duty to provide the funds for the Project.

161.     Panasonic, at all times, performed its duties under the Agreements.

162.     Defendants had a duty to execute their duties related to the Project pursuant to the Agreements and apply the Contribution and Additional Contribution funds to expenses necessary to carry out the Project.

163.     Instead of exercising that discretion in good faith and consistent with Panasonic's reasonable expectations, Defendants abused their discretion by allocating unearned and unauthorized monies to themselves from the Contribution funds provided by Panasonic for the Project.

164.     Defendants further breached the covenant of good faith and fair dealing by misrepresenting the need for the Additional Contribution.

165.     By exercising its discretion to enrich themselves, Defendants consciously and deliberately frustrated the purpose of the agreed upon common purposes of the Agreements and deprived Panasonic from the benefit of its bargain.

166.     Panasonic has sustained damages as a result of Defendants' breaches of the Agreements.

167.     Panasonic also sustained damages in the form of its Contribution and Additional Contribution, federal tax rebates which would have been received upon completion of the Project and lost profits.

**FOURTH CLAIM FOR RELIEF**
**Anticipatory Breach of Contract**
**(Against All Defendants)**

168.    Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-167 of this Complaint.

169.    As stated above, the Agreements govern the duties and obligations between Panasonic and Defendants pertaining to the Project.

170.    Defendants anticipatorily breached and repudiated the Agreements by clearly and unequivocally making clear they were not going to complete the Project, ceasing all work that was in progress, and abandoning the Project Sites.

171.    Following Defendants' unequivocal and total repudiation of the Agreements, Defendants have not returned the Contribution or Additional Contribution to Panasonic or reimbursed Panasonic for the Contribution and Additional Contribution already provided.

172.    Each Defendant's anticipatory breach and repudiation has not been retracted.

173.    At all times, Panasonic performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms of the Agreements.

174.    As a direct and proximate result of Defendants' anticipatory breach and repudiation of the Agreements, Panasonic has sustained damages, including, but not limited to its Contribution and Additional Contribution, federal tax rebates which would have been received upon completion of the Project and lost profits.

**FIFTH CLAIM FOR RELIEF**
**Conversion**
**(Against All Defendants)**

175.    Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-174 of this Complaint.

176.    Defendants had and continue to have a duty to maintain the Contribution and Additional Contribution funds from Panasonic for the sole purpose of completing the Project.

177.    Defendants wrongfully accepted over $5 million dollars from Panasonic under false pretenses of completing the Project.

178.     Defendants, without proper authorization or agreement, assumed and exercised the right of ownership over the funds by dispersing it to themselves unrelated to carrying out the Project without legal or contractual justification.

179.     Defendants continue to retain these funds without the consent of Panasonic. Defendants intend to permanently deprive Panasonic of these funds.

180.     These funds are property owned by Panasonic, not Defendants, if it has not, and will not be used for the Project, and which Defendants have now claimed ownership over.

181.     Panasonic is now entitled to the immediate possession of these funds.

182.     Defendants wrongfully converted these specific and readily identifiable funds and Defendants wrongful conduct is continuing.

183.     As a direct and proximate result of this wrongful conversion, Panasonic have suffered and continue to suffer damages.

184.     For all these reasons, Panasonic is entitled to receive from Defendants all damages and costs permitted by law, including all amounts wrongfully converted by Defendants.

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against All Defendants)**

185.     Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-184 of this Complaint.

186.     Defendants obtained over $5 million dollars of funds from Panasonic for the Project, which was never completed and has since been abandoned by Defendants, resulting in Defendants allocating unearned and unauthorized funds to themselves for work they never completed and retaining excess funds that was never used for the Project.

187.     Defendants were unjustly enriched at the expense of Panasonic. Money and property belonging to Panasonic were unjustly taken by Defendants.

188.     It would be inequitable and unconscionable for Defendants to retain the Contribution funds and property they obtained from the conduct alleged herein.

189.     Panasonic seeks restitution from Defendants, and an order disgorging all profits,

benefits, and other compensation obtained by Defendants from their unlawful practices of fraudulently obtaining Contribution/Additional Contribution funds from Panasonic.

## SEVENTH CLAIM FOR RELIEF
### Fraud
### (Against All Defendants)

190.    Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-189 of this Complaint.

191.    Defendants made material representations of fact related to the Project, the status of the Project, the Accounting, and need for accelerated Contributions.

192.    These material misrepresentations include representations designed to induce Panasonic to provide both Contributions and to keep Panasonic from discovering their scheme.

193.    Defendants made material misrepresentations related to their ability to obtain the SGIP Incentive.

194.    Defendants' representations were false and misleading, including as it relates to its ability to complete the Project and receive the SGIP Incentive, the need for the accelerated Contributions, and future payments to Panasonic.

195.    Defendants knew its representations were false and misleading, or at least recklessly disregarded whether its representations were truthful.

196.    Defendants made its representations to Panasonic to act in reliance upon them.

197.    Panasonic reasonably relied on Defendants' representations, and as a result, made multiple Contributions for the Project.

198.    Panasonic is entitled to recover the full amount of its Contributions, plus the promised payment pursuant to the Agreements.

199.    Defendants' actions were malicious, fraudulent, oppressive, and intended to injure Panasonic, and thus Panasonic is entitled to recover punitive damages.

## EIGHTH CLAIM FOR RELIEF
### Fraud by Concealment
### (Against All Defendants)

200.    Panasonic re-alleges and incorporates herein by reference the matters alleged in

paragraphs 1-199 of this Complaint.

201.    Each Defendant committed fraud through their scheme of engineering, constructing, and implementing the Project for the purpose of fraudulently obtaining Contribution and Additional Contribution funds from Panasonic while intentionally and knowingly delaying and obstructing the completion of the Project.

202.    Defendants concealed from Panasonic the reason for delays for meeting CPUC deadlines for the SGIP Incentive reservation and also concealed that Defendants failed to complete the project.

203.    Defendants concealed the true reasons for the delay to the CPUC in order to obtain multiple extensions for the SGIP Incentive reservation and used the extensions to perpetuate its concealment of the reasons for delay to Panasonic in order to obtain Additional Contribution funds.

204.    Defendants represented to Panasonic that delays to the Project were caused by PG&E. Defendants also represented to Panasonic that they would be able to meet the CPUC deadlines if it received Additional Contribution funds from Panasonic.

205.    But, Powertree, PTSF1 and Danlin intentionally concealed, suppressed, omitted, and failed to disclose the material facts that delays were caused by them, not PG&E and that they would not be able to timely complete the Project to receive the SGIP Incentive.

206.    Defendants, by fraudulently concealing the true reason for the delays, were able to obtain Additional Contribution funds from Panasonic.

207.    In justifiable and reasonable reliance on Defendants' multiple material concealments, Panasonic was induced to act and provide the Contribution and Additional Contribution to meet CPUC deadlines and receive the promised SGIP Incentive.

208.    Panasonic was informed by Defendants that the SGIP Incentive reservation had been extended multiple times.

209.    Had the truth behind the reason for the need for the extensions been disclosed, Panasonic would have been aware of the issues surrounding the completion of the Project and the

risk of the Project not getting completed and would not have provided accelerated Contributions to Defendants.

210.   Panasonic was harmed by the deliberate material concealments by Defendants and ongoing multiple concealments.

211.   Panasonic sustained damages because Defendants fraudulently concealed the Project plans when Panasonic entered into the EPC and again when Panasonic accelerated Contribution funds when material facts were concealed from it.

212.   Defendants' material concealments were a substantial factor in causing Panasonic's harm and damages.

213.   Because of Defendants deceit, and concealment of material facts, Panasonic has suffered damages in excess of its Contribution and Additional Contribution.

214.   Further, Defendants' conduct was done wantonly, maliciously, oppressively, deliberately, with the intent to defraud; in the reckless disregard of Panasonic's rights; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## NINTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### (Against All Defendants)

215.   Panasonic re-alleges and incorporates herein by reference the matters alleged in paragraphs 1-214 of this Complaint.

216.   Defendants negligently represented to Panasonic that the Project would be timely completed, that delays were caused by PG&E, that Additional Contribution was required to meet the SGIP Incentive and complete the Project, and that the Project would qualify for the SGIP Incentive.

217.   Each and every statement of fact represented by Defendants were a material representation represented as true to induce Panasonic to act.

218.   Each and every representation by Defendants to Panasonic were negligently made.

COMPLAINT

219.    For each of the representations Defendants made to Panasonic, Defendants had no reasonable grounds to believe any of the material representations were true.

220.    Defendants had no reasonable grounds for believing the representations were true when they made them because, as the EPC Engineer, SGIP Incentive applicant, Installation Contractor, and the only contact for PG&E on the interconnection, Defendants knew that the delays were caused by their own doing and that the deadlines set forth by the CPUC would not be met for the SGIP Incentive.

221.    Defendants made the representations with the intent to cause Panasonic to rely on these representations, induce Panasonic to act, and knowing that Defendants had no reasonable grounds for believing the representations to be true when they made them.

222.    Panasonic was harmed and damaged as a direct result of Defendants' negligent representations.

223.    Panasonic's reliance on Defendants' express false representations, and having no reasonable grounds to believe any of the representations were not true, was a substantial factor in causing Panasonic's harm.

224.    Because of Panasonic's reliance upon Defendants' conduct, Panasonic suffered damages in excess of its Contribution and Additional Contribution.

225.    Further, Defendants' conduct was done wantonly, maliciously, oppressively, deliberately, with the intent to defraud, in the reckless disregard of Panasonic's rights, and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Panasonic prays for judgment as to each of its claims for relief against Defendants as follows:

1.    Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under RICO, punitive damages, and exemplary damages;

2.    Disgorgement of the ill-gotten gains derived by Defendants from its misconduct;

3.  All applicable damages, including punitive damages;

4.  An order requiring Defendants to pay both pre-judgment and post-judgment interest at the maximum legal rate;

5.  An award of attorneys' fees and costs, including expert costs;

6.  Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

7.  Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Panasonic demands a trial by jury of any and all issues in this action so triable by right, pursuant to Federal Rule of Civil Procedure 38(b).

DATED: February 9, 2021                 MCGUIREWOODS LLP

                                        By:  */s/ Alicia A. Baiardo*
                                             Alicia A. Baiardo

                                        *Attorneys for Panasonic Corporation of North America*